IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

TONI R DONAHUE individually and on
Behalf of minor child, DCD
_____

Plaintiff(s)

Vs.                                              Case No.  _2:18-cv-02055_

GOVERNOR SAM BROWNBACK
_____

Defendant

## AMENDED COMPLAINT AND DEMAND FOR TRIAL BY JURY

Now come the Plaintiff on her own behalf and on behalf of minor child DCD, through

Pro Se counsel, pursuant to Winkelman v. Parma City School Dist., 550 U.S. 516 (2007), and

complain of the defendant as follows:

## NATURE OF THE CASE

1.      This is a suit brought, in part, under the Equal Protection and Substantive Due

Process Clauses of the Fourteenth Amendment (42 U.S.C. Sec 1983, U.S. Const. Amend. XIV),

section 504 of the Rehabilitation Act of 1973, IDEA 2004

2.      Minor child is a disabled child who, from 2015 to current had experienced and

will continue experience serious and permanent damage caused by the Defendant's willful and

wanton callous failure to protect and the willful and wanton callous indifference to the

educational needs of disabled children, in this case, specific to DCD.  Both plaintiff's have been

and are presently subjected to the unconstitutional effects and/or application of Kansas' Freedom

from Unsafe Seclusion and Restraint Act including.

3.      This action seeks compensatory damages for both plaintiff's who have been

subjected to the constitutional violations arising from the defendant's callous indifference and

failure to protect, in the creation of policies and practices resulting from The Freedom from

Unsafe Seclusion and Restraint Act.  This act provides that educators are permitted to use 4x4

isolation prison cells located inside special needs classrooms at their discretion with little or no

oversight. As a direct result of the defendant's indifference and failure to protect, and his

individual actions, both plaintiffs have suffered irreparable injury.  Mother of DCD continues to

face unrelenting retaliation for her actions to protect her child, by agencies under the defendant's

authority including DCF and Child Support Enforcement.  DCF has repeatedly cut off all related

services for the Plaintiff including food and medical, which generally occurs within a week to a

month after legal action.  The Plaintiff has been subject to arbitrary reviews repeatedly and DCF

participated in an attempt to remove DCD from the care of his mother as a direct result of filing

complaints to protect him from this unconstitutional law.  Plaintiff has been maliciously

prosecuted in order to prevent this case from seeing daylight, in which the plaintiff prevailed.

Although the State's attempt to remove DCD from the home in the malicious Child in Need of

Care complaint, which failed miserably, that act of retaliation took nine months of the plaintiff's

lives, and immeasurable distress for the Mother.

4.      This action seeks injunctive relief in regards to the use of isolation cells in Kansas

public schools which DCD was subjected to constitutional violations arising from the

defendant's callous indifference and failure to protect in the creation and usage of these cells.

5.     The importance of education has been addressed by the U.S. Supreme Court: [N]either is [education] merely some governmental "benefit" indistinguishable from other forms of social welfare legislation.  Both the importance of education in maintaining our basic institutions, and the lasting impact of its deprivation on the life of the child, mark the distinction. The American people have always regarded education and [the] acquisition of knowledge as matters of supreme importance.  We have recognized "the public schools as a most vital civic institution for the preservation of a democratic system of government," and the primary vehicle for transmitting "the values on which our society rests." "[A]s… pointed out early in our history…some degree of education is necessary to prepare citizens to participate effectively and intelligently in our open political system if we are to preserve freedom and independence.  And these historic "perceptions of the public schools as inculculating fundamental values necessary to the maintenance of a political system manager have been confirmed by the observation of social scientists."  In addition, education provides the basic tools by which individuals might lead economically productive lives to the benefit of us all.  In sum, education has a fundamental fabric of our society.  We cannot ignore the significant social costs borne by our Nation when select groups are denied the means to absorb the values and skills upon which our social order rests.  In addition to the pivotal role of education in sustaining our political and cultural heritage, denial of education to some isolated group of children poses an affront to one of the goals of the Equal Protection Clause:  the abolition of governmental barriers presenting unreasonable obstacles to advancement on the basis of individual merit.  Plyer v Doe 457 U.S 202, 221 (1982)

6.     The Due Process Clause of the U.S. Constitution guarantees that an individual will not be deprived of life, liberty, or property without due process of law.  US CONST. amend.

V. Furthermore, under the Fourteenth Amendment no one may be deprived of life, liberty, or property without due process of law" nor be denied equal protection of the laws.  US CONST amend. XIV, § 1.  DCD was forced into a 4x4 isolation prison cell to serve "shock time" repeatedly between the dates of April 2015 and October 2015.

7.      The Sixth Amendment guarantees that In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defense.

8.      The Eighth Amendment guarantees protections from **cruel and unusual punishments inflicted.**

9.      These constitutional provisions serve to protect citizens, including disabled children, specifically DCD, from the deprivation of fundamental rights…those rights specifically identified in the Constitution or principles of justice so rooted in the tradition and conscience of our people as to be ranked as fundamental and therefore implicit in the concept of ordered liberty.  See e.g. Washington v Glucksberg, 521 US 702, 721.  In passing the Freedom from Unsafe Seclusion and Restraint Act, the defendant revoked the full scope of local legislative power and bestowed it upon untrained educators inside the classroom.  This action infringes a fundamental right and violates substantive due process because it establishes a system that is fundamentally unfair.

Furthermore, IDEA 2004 guarantees DCD's right to a Free and Appropriate Education for disabled children, specifically DCD and provides protections from retaliation

## JURISDICTION AND VENUE

10.     This action is brought pursuant to 42 U.S.C. § 1983 and the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.  This Court has jurisdiction over these claims under 28 U.S.C. §1331 and 28 U.S.C. § 1343.  This Court also has jurisdiction under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* and Section 504 of the Rehabilitation Act of 1973.  This court also has jurisdiction over claims arising out of IDEA 2004.  This court also has jurisdiction under 20 U.S.C. §§ 1400 *et seq.*  and the provisions of any other Federal statute prohibiting the discrimination by recipients of Federal financial assistance.  This Court has jurisdiction over the supplemental state law claim under 28 U.S.C. §1367 because that claim forms part of the same case or controversy under Article III of the United States Constitution.

11.     Venue is proper pursuant to 28 U.S.C. §1391(b) because each claim arose in the District of Kansas and because the Parent and Student Plaintiff are residents of this District.

## PARTIES

12.     Plaintiff, Toni Donahue is the natural guardian of DCD.  Plaintiff is representing herself and  minor child, Pro Se, pursuant to Winkelman v. Parma City School Dist., 550 U.S. 516 (2007).  Plaintiff is a resident of Kansas.

13.     Plaintiff, DCD is a minor child diagnosed with Autism Spectrum Disorder.  DCD is a 7th grade special needs student at all relevant times residing and educated in Kansas.

14.     Defendant Sam Brownback is the Governor of Kansas and this lawsuit is brought against him individually and in his official capacity. At all relevant times defendant acted under the color of State law.  Brownback, based on upon his intentional acts and policies which he implemented and/or which he acquiesced, is directly responsible for the violation of the plaintiff's constitutional rights under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments.  The defendant resides in Kansas.

## FACTS

15.     Governor Sam Brownback signed into law the Freedom from Unsafe Seclusion and Restraint Act on May 27, 2015.  The passage of The Freedom from Seclusion and Restraint enabled Kansas school districts to legally construct and use prison isolation cells inside school special needs classrooms.

16.     Governor Sam Brownback signed the Freedom from Unsafe Seclusion and Restraint Act with the full knowledge of the United States Senate,  HEALTH, EDUCATION, LABOR, AND PENSIONS COMMITTEE Final Report (Majority Committee Staff Report February 12, 2014) and the Government Accountability Report (GAO, 2009) Both clearly state the children exposed to these prison isolation cells have little or no protection from abusive educators, the practice causes serious short and long term trauma for all children (both the children witnessing the implementation on other students, and especially the children who are forced into these rooms).   Both reports indicate that children exposed to the practice experienced

6

severe psychological trauma, physical injuries, and death.  Both reports indicate a widespread practice of educator abuses related to the use of the cells.

17.     The Senate report and the GAO report do NOT recommend the use of these cells and if the states are determined to use these cells, to only use them in cases of "imminent threat of serious bodily injury".

18.     According to IDEA 2004: "The term "serious bodily injury" is defined in Section 1365(h)(3) of Title 18, U.S. Code, to mean a bodily injury that involves a substantial risk of death, extreme physical pain, protracted and obvious disfigurement, or protracted loss or impairment of the function of a bodily member, organ, or mental faculty. [615(k)(7)(D)]

19.     Governor Brownback changed the language to only use seclusion and restraint to "imminent *risk* of bodily injury" (omitting the word, "serious" and replacing the word "threat" with "risk").  This act set aside both the Senate and GAO's intensive multiple studies proving the dangers to the children amounting to torture, and allows the teachers to implement the punishment based on frivolous or minor actions, or no actions whatsoever based their written *opinion* of what "*may*" happen next "*may*" cause a scratch, or papers to land on the floor. DCD's teacher allegedly forced him into the cell on 4/10/2015 for pushing papers onto the floor.  Under no legal circumstance would a "typical" child be jailed for pushing papers on the floor.  Nor would any "typical" child (or adult) be incarcerated for what "*may*" happen in the future.

20.     According to documentation provided by Olathe Unified School District #233 (OSD) DCD reportedly served "shock time" in a 5x4 isolation prison cell, located inside his autism classroom at Prairie Center Elementary School, on at least 6 occasions between 4/10/2015 and 10/23/2015.  Plaintiff has reason and cause to believe that DCD was forced into the isolation prison cell more frequently than the teacher reported. When confronting the educator and district, both stated that the plaintiff needed to take it up with the defendant as it was his directive to use the isolation cell on DCD.   During this time he severely digressed emotionally, socially, educationally, and suffered approximately 65-75 moderate injuries including injuries to his head, torso, back, arms, and legs, periodic occurrences of handprint bruising on his arms, wrists, ankles, and feet only while in the care of two educators.  DCD  began wetting the bed nightly, getting up to turn off the alarm hours before it sounded in the mornings, having panic attacks, anxiety attacks,  and going into hysterics screaming, crying, and hiding when the bus pulled up to the door.  On the occasions that TD confronted the teacher, DCD would come home with more injuries.  The failure to add safeguards such as video monitoring caused DCD's prolonged, unchecked abuse and torture at the hands of his educator.  Although the District is responsible for their individual actions, they were acting under the unconstitutional Act signed into law by the Defendant.  The District placed ALL blame on Brownback.  However, the Plaintiff alleges the accountability is on both the District **and** the Defendant.  The Defendant is directly responsible for the outrageous harm, physical, psychological, educational, and social injuries caused to DCD associated with the Isolation prison cell. Signing the unconstitutional Freedom from Unsafe Seclusion and Restraint Act into law, which legalized the use of torture chambers targeting special needs children, is the direct cause of DCD's digression, severe distress and injuries.  The defendant is directly responsible for failure to protect DCD by purposefully failing

in all aspects, to protect DCD from harm caused by the act.  The Act is current and has created

an atmosphere of violence and inhumane treatment and it is unsafe for Plaintiff to return DCD to

any Kansas public school in an ongoing and perpetual conflict.

21.     Although it is illegal for a tax paying citizen to construct and use cells in their

private homes for the same purposes (as a result are arrested, children removed, and the accused

are charged with various criminal acts), The passing of the Freedom from Unsafe Seclusion and

Restraint Act, Governor Brownback provided a legal means for educators to hold hostage,

forcibly modify behavior (coercion), and torture special needs children, specifically DCD.

22.     Governor Brownback's Freedom from Unsafe Seclusion and Restraint, in its

entirety, failed to protect the children exposed, including DCD, under the color of law and in fact

provided the means for educators to legally abuse their students by removing all forms of

essential constitutional protections. This bad faith, discriminatory, and draconian Act, in its

entirety, denied DCD the civil rights protections afforded by the United States Constitution.  It,

in effect, created an alternate Constitution and set of statutory laws/rules resurrecting *segregation*

*in laws* - the equivalent of Jim Crow laws targeting the disabled student population.

23.     Governor Brownback's created a bureaucratic monopoly that completely

eliminates viable advocacy against the bill or on behalf of the rights of the individual, DCD, by

utilizing the organizations that receive funding as protective services such as Disability Rights

Center to create the bill.  In effect, the plaintiff discovered that the advocate agencies refused to

go against the governor or the bill regardless of the rights of the individual because of the

"consensus" and potential political conflicts or consequences to reputation.  The Kansas Human

Rights board members were all appointed by Governor Brownback, DRC was designated by

Brownback as Kansas protective services (and receive the directed funding for those services),

and Families Together were also on the task force created by Governor Brownback.  By

deliberately creating this monopoly, Governor Brownback denied DCD the equal protection as

defined by Federal law and put a "cap" on the actual civil rights granted to DCD by eliminating

options available for his advocacy.


24.     Plaintiff contacted Governor Brownback to discuss the Freedom from Unsafe

Seclusion and Restraint statutes directly with the governor.  On 11/17/2015 Plaintiff met with

Constituent Services on behalf of Governor Brownback.  During this meeting, the representative

had no idea these prison isolation cells were in existence let alone endorsed by Governor

Brownback or state law.


25.     February 9, 2015 Plaintiff and DCD together addressed Kansas legislatures

regarding DCD's experience, the abuses, the isolation room, and the gross violation of his human

rights.


26.     Plaintiff found out Governor Brownback would be present for a juvenile justice

bill signing at Olathe, Kansas Court.  She and minor child went together and spoke with

Governor Brownback in person following the event.  The Plaintiff explained who she was, and

why she was there and provided Governor Brownback with a printed copy of the testimony she

delivered to Kansas Legislatures on 2/09/2016.  This copy included photos of the isolation cell

inside DCD's classroom and the testimony itself was a statement addressed directly to Governor Brownback and covered the human rights violations.  Governor Brownback read the document, folded it in half, and placed it in his inside jacket pocket.  This document served as a notice that his law was a gross violation of DCD's human rights and constitutional protections.

**Plaintiff is challenging the constitutionality of the Freedom from Unsafe Seclusion and Restraint Act.  She contends that the law violated DCD's protections by the United States Constitution as described in the Bill of Rights**

**The Freedom from Unsafe Seclusion and Restraint Act is Discriminatory by targeting a specific and federally protected culture (disabled population):**

27.    The prison cells are located inside the special needs classrooms.  There are no cells located inside general education classrooms.

28.    The cells are not located in central areas.  Nor are they visible or accessible to anyone outside of the special needs classroom.

29.    The prison cell inside DCD's classroom was front and center, located roughly 3 feet from his desk.  The cell was an ever present threat and created a hostile learning environment.

30.    The design of Governor Brownback's task force clearly targets the special needs population by exclusively utilizing professional members of the special needs community and

specifically requiring members have special needs children. The task force does not require the members to have "typical" children.  The task force members are discriminatory and clearly indicate the law was created targeting the special needs population and NOT the general student population.

31.     In the Olathe School District, during the first semester of the 2015-16 school year, 26 students were forced into these cells 480 times.  All 26 students were special needs students; all 26 had IEP's.  The same time frame, Blue Valley School District 100% of the student exposed were special needs students with IEP's.  The same time frame, Shawnee School District 100% of the students was special needs students with IEP's.  Not one typical student was forced into the prison cells in any of the districts even when adult staff members and students attacked a student, even when two teens were in a knife fight, even with the many fist fights and imminent threats of violence between "typical" students.  These rooms are designed exclusively for use on special needs students.

32.     "Typical" students have separate and completely different state laws and local policies for violating the student code of conduct – even in violent circumstances.

**Failure to Protect:**

33.     Governor Brownback failed to provide follow-up oversight on existing isolation cells and /or construction of cells.  According to state law and federal guidelines, all isolation rooms are to be in proportion in size to other rooms frequented by the student throughout the day.   Kansas isolation rooms are roughly 5x4 in all the major districts.  This is, in fact, smaller

than a bathroom stall and nowhere near the size and proportion of any other rooms students frequent.  KS 72-89d03(e)

34.     The Freedom from Unsafe Seclusion and Restraint Act failed to protect DCD by endorsing a practice that has been proven to cause severe psychological, emotional, and/or physical trauma and put his life in jeopardy as a direct result of passing the Act.

35.     The entire Freedom from Unsafe Seclusion and Restraint Act is a one sided law protecting only the staff and districts.  There are absolutely no protections in this law for students.

36.     Many of the children in special needs classrooms, including DCD, are non-verbal and DCD had no way to report the abuses inside the classroom.  Governor Brownback failed to implement safe-guards for the students before, during, and after their "shock-time" incarceration.

37.     All juvenile centers, prisons, and psychiatric facilities using isolation prison cells, have video protections in place for both the staff and the individuals.  Any reasonable individual would expect video protections for the most vulnerable population, many of whom are non-verbal. Governor Brownback's law created soft targets for abuse by failing to implement video protections.  DCD had no way to convey the abuses he was suffering at the hands of his educator and his classroom became a torture chamber under the color of law.

38.     Videos cannot be falsified like the documentation currently required- and videos would have ensured the integrity of the individuals who claim they cannot implement evidence based practices without the use of the isolation prison cells.

39.     The requirements of the law are handwritten statements by the educators.  These statements can be, and often are, falsified to fit the language of the law.  On the 4/10 incident, DCD was forced into the room and at the time the staff and district contended that it was for "positive behavior supports".  After May 27th, 2015 the language changed and became "imminent threat of harm".  The same punishment, different written rational with two totally opposite meanings.  The teachers who use these rooms will write in whatever the law requires them to in order to continue the bad practice.

40.     For example, the 9/18 incidents, the principal filtered the teacher's statement over a telephone call which was not a conference call.  During the official meeting with the principal, teacher, and Plaintiff, after Plaintiff asked about the handprint bruising on DCD's ankles, Plaintiff demanded that any para present needed to attend the meeting to validate the teacher's story.  The legal requirement is that anyone present during the incident be in the meeting.  The teacher stated she was alone with three 1:1 students and had to cut DCD's breakfast and lunch short that day due to a shortage of paras because of the budget cuts.  She stated that her paras came in later in the day.  However, on the data submitted to the state for the ESI incident, paras were added as staff present – these additions were not listed on the documents TD received.  The statements submitted during the subsequent KSDE investigation were prepared by the district

and the district staff counsel and were worded to completely exonerate the teacher per the

language of Governor Brownback's law.


41.     Another example:  On the 10/23 incidents the district special needs coordinator

had a meeting with the teacher and principal prior to Plaintiff's arrival.  This meeting was a

coaching session from the district to the teacher.  However, Plaintiff recorded the official ESI

meeting on a handheld recorder.  The state required documentation provided to TD did not have

any witnesses listed.  The state required documentation had the date October 22nd written on it

and October 23nd written over the top of it.  During the recorded meeting, the teacher failed to

identify exactly when DCD was placed in the cell.  Plaintiff repeatedly asked her but the teacher

continued to refer back to previous days.  At no time did she indicate a plausible reason to use

the cell on any of the days she was discussing, especially 10/23.  In one portion of the recording,

the teacher attempted to emphasize a "violent" outburst from the previous day and referred to the

principal alleging DCD hit her.  Plaintiff asked if it was "imminent threat" and the principal

laughed and said "no".  The required documentation to be submitted to the state had additional

staff members present and on a second data sheet for the state showed an ESI incident from a

different day with times and staff members was marked through with a black scripto.  Directly

below this entry was the entry for 10/23 and had even more additional staff members than the

other documents.  DCD was the only student at Prairie Center who had any ESI incidents.  The

statements to KSDE for the subsequent investigation was also prepared in retro by the district

and the district staff counsel but this time they were unaware that Plaintiff had recorded the

meeting.  The statements for the ESI incident were completely fraudulent.  The Freedom from

Unsafe Seclusion and Restraint's requirements for handwritten statements is arbitrary and in place for the sole purpose of protecting school districts.

42.     There are no safeguards in place to prevent falsification of documentation.

43.     There are no legal ramifications/consequences for Educators who falsify data or submit fraudulent statements, data, documentation, during KSDE investigations, or USDOE investigations.  Parents have few avenues to protect their children and by filing local due process, State, or Federal complaints, neutral fact finding is arbitrary when Districts and employees face no consequence for fraud or collusion.  Equal protection is denied to the families of abused children by providing this loop-hole to avoid accountability by educators, administrators, and districts.

44.     On 9/18/2015 the educator was alone with DCD and two other students with Autism.  When she forced DCD into the cell, she was the only witness to determine if the action was warranted, her statement changed several times, and eventually colluded with the administration and the staff lawyer to create an entirely fraudulent statement for the Kansas State Department of Education investigation.

45.     Governor Brownback is the head of the Department of Children and Families
(DCF).  With the implementation of the Freedom from Unsafe Seclusion and Restraint,
Brownback failed to include required training for DCF social workers in how to
recognize/identify educator abuse, or any protections for potentially abused special needs
children inside Kansas classrooms.


46.     Governor Brownback failed to implement policy changes at DCF in accordance
with the legalization of isolation prison cells inside special needs classrooms. Which directly
resulted in the State's failure to investigate an abuse complaint against the educator, further
victimizing DCD.


47.     Governor Brownback omitted language in the law that would allow parents to be
mandated reporters and require DCF to investigate legitimate claims of educator abuse.


48.     Governor Brownback failed to implement training for local police departments for
investigations pertaining to educator abuse in relation to the isolation prison cells.


49.     Governor Brownback failed to require a disability liaison officer at local police
stations trained to impartially investigate disability related complaints.  Which directly resulted
in the failure to investigate an abuse claim against an educator, further victimizing DCD and
causing irreparable harm to plaintiff's reputation in the Law Enforcement community.

50.     As of the date of this filing, no investigation has been made into the torture, educator abuse, or illegal use of the isolation prison cell at Prairie Center Elementary School, perpetrated against minor child, DCD.  The district publicly stated, on KSHB 41 news, and during the KSDE investigation, that DCF and the OPD conducted "thorough" investigations and determined that the plaintiff's claims were entirely false.  To date, no investigations have occurred whatsoever.  This brings to point that DCD has received no justice (let alone "equal justice") for what he endured at the hands of a violent educator.

51.     DCD has been diagnosed by two independent behavior therapists with Post Traumatic Stress Disorder (PTSD) as a direct result of the torturous use of the Isolation prison cell that the Defendant clearly understood caused irreversible harm when he passed the law.

52.     Plaintiff and DCD lost their home, vehicle, and all sources of income when the Plaintiff assumed the duties of the public school system as a direct result of their repeated constitutional violations of the Freedom from Unsafe Seclusion and Restraint Act.

53.     As a direct result of the actions of the defendant, the Plaintiff was forced to drop out of college in her last semester of college to provide a safe learning environment and therapies for DCD.  Plaintiff was arguably the top Administration of Justice student in the country, with a 4.0 G.P.A. , National Honor's student, Presidential Deans list, and she also lost a full academic scholarship and recruitment offers from Columbia, Penn, and Harvard.

54.     Defendant is responsible for all of the losses as he was fully aware, as any reasonable person in his position would be, that he was violating the Constitution when he signed the Freedom from Unsafe Seclusion and Restraint Act into law.

55.     Defendant is individually responsible for all the damages and losses as he was fully aware that he was not providing equal protection for the students, including DCD, under the discriminatory law before he signed it.

56.     Defendant is individually responsible for all the damages and losses as a direct result of failing to train, implement policies, or supervise the agencies under his authority.

## FEDERAL QUESTIONS

**PLAINTIFF IS CHALLENGING THE CONSTITUTIONALITY OF THE FREEDOM FROM UNSAFE SECLUSION AND RESTRAINT ACT.**

**1.     Does the Freedom from Unsafe Seclusion and Restraint (in its entirety) violate the United States Constitution?**

**2.     Did the Freedom from Unsafe Seclusion and Restraint Act violate DCD's Fourth Amendment Rights?**

**3.     Did the Freedom from Unsafe Seclusion and Restraint Act violate DCD's Fifth Amendment Rights?**

**4.     Did the Freedom from Unsafe Seclusion and Restraint Act violate DCD's Sixth Amendment Rights?**

**5.     Did the Freedom from Unsafe Seclusion and Restraint Act violate DCD's Eighth Amendment Rights?**

**6.     Did the Freedom from Unsafe Seclusion and Restraint Act violate DCD's Fourteenth Amendment Rights?**

**7.       Is the Freedom from Unsafe Seclusion and Restraint Act discriminatory?**

## RELIEF SOUGHT

1.       Plaintiff is requesting injunctive relief to immediately discontinue the use of these rooms until they have been determined constitutional,

2.       Plaintiff is seeking injunctive relief to immediately provide protections in place such as cameras,

3.       Plaintiff is seeking injunctive relieve to require Kansas isolation rooms to be up to statute which requires the size of the rooms to be proportional to other rooms DCD frequents during his school day, all these are to enable DCD to return to public school in a safe environment as defined in IDEA 2004 which includes FAPE.

4.       Plaintiff is requesting injunctive relief to immediately address the critical gaps in agency protections under Governor Brownback's authority, for the protection of children, specifically DCD in this case, from abuse by educators.  Such as providing disability liaison officers for the county, and training for both police and DCF in recognizing and acting on educator abuses against disabled children.

5.        Plaintiff is requesting damages from the Defendant in his individual capacity to compensate the claimant for loss, injury, and harm suffered as a result of the defendant's actions in the amount of $5,000,000

6.       Plaintiff is seeking punitive damages for herself and DCD in an amount to be determined by the court.

Plaintiff is seeking a jury trial

Plaintiff requests the case be tried in Kansas City, Kansas Federal Court.

2/12/2018

Toni R Donahue

322 S. Broadway Street

Fort Scott, Kansas 66701

tr.donahue@yahoo.com